The next case on the calendar for today is number 21-1553. Birch Family Services v. Wlody. Good morning, Your Honors. My name is Robert Schoenfeldt-Moore. Sorry. Give a second for the conversation to get situated. Thank you. Thank you. Mr. Schoenfeldt. Good morning. My name is Robert Schoenfeldt-Moore, Hock and Hambrock, sitting next to me is Matthew Della Torre from my firm, too. We're the attorney for the appellant, Birch Family Services. The district court did get some things right. It correctly held that a reasonable jury could have found that the Wlody's had animus based on the race of the staff and the disability of the residents on the undisputed text and email sent by Corinne Wlody using code language and by the use of the n-word on several occasions by Jack Wlody. Towards at least two of the staff members. The district court also correctly held that a reasonable jury could have found that the Wlody's constant and pervasive videotaping of the residents and staff of the Birch residence, including thousands of videotapes, constitute interference with Birch's use of the residence in violation of the Federal Fair Housing Act. The Wlody's did not dispute the affidavit of Birch's residence manager, Cheryl Martin Walker, stating that the Wlody's were constantly videotaping the Birch residence and staff, sometimes coming up close to the residence and staff cells to provoke a confrontation. So the district court did correctly find that Birch had shown a prima facie case of evidence on the part of the Wlody's under the Federal Fair Housing Act. That shifted the burden of production of evidence to under the Burdine decision and several decisions of the Supreme Court thereafter, this court, it shifted the burden to the Wlody's to produce evidence supporting a legitimate reason for its pervasive videotaping. That evidence had to be clear and specific and not conclusive on the Mary v. Dakin and on the Mandel v. County of Suffolk and also on the Burdine. So Birch had a chance to respond to demonstrate that those reasons were protection. The Wlody's failed to produce clear, specific, and non-conclusive evidence supporting a legitimate reason for its pervasive videotaping. Can I just, can I just, I have a question about that. Yeah. So their position is that the, you know, various incidents that had happened at the Birch House or nuisances and those types of things, that those were the reasons for the videotaping. And on the face of that, that is not a discriminatory reason on its face. In rebutting that, what have you, what are you pointing to to allege that this is pretext? It's, thank you, it's pretext because the evidence in this case doesn't show any evidence showing that there was a legitimate reason. The Wlody's as their evidence in the district court basically said there's wrongful behavior by the staff and abusing the residents. But there's no evidence on this record showing wrongful. Well, there definitely is evidence of various activities that someone could complain about, whether it's loud music or blocking the driveway or what have you. You're correct, Your Honor, but that doesn't require. Ms. Martin Walker put an affidavit that was unrebutted by the Wlody's basically saying that the Wlody's came out in the morning when the residents and staff got to the bus to go into the day program on the way back, saying that videotaping is people. That has nothing to do with noise or parking their cars in the wrong place or double parking. If they want to take pictures of double parking or cars, if that's what this is all about, it may not have been a case here. What we're doing is a pervasive videotaping. So the fact that they're videotaping as opposed to taking pictures is evidence of pretext? Yes, either one. Either constant videotaping or constant pictures. They showed also there's a video log, which we introduced, and the video log went way, way beyond wrongful behavior by staff. For example, when Mr. Dellatore and I went to visit the Birch Home, we were videotaped. They videotaped, to take one example out of the log, some resident shouted out to someone in the street, hey, she needs one. And that got videotaped. So the videotaping went way, way beyond its pervasiveness, the amount of videos. Thousands and thousands of videos. Why am I not entitled under, for example, the First Amendment to sit in my living room or sit on my front porch and video anybody I want to? There's a case in the United States Supreme Court called Frisbee that's not protected by the First Amendment, saying that somebody who did that was not protected by the First Amendment. It was a decision of Justice O'Connor back from the 1980s. It involved a law which prohibited, a local law prohibiting such taping or videotaping somebody, from videotaping people coming to a particular house as opposed to, let's call it a... I'm sorry. I'm sorry, a particular house. In other words, it's different when you videotape, let's suppose, public officials as opposed to targeting one house. And Justice O'Connor wrote in the Frisbee case from 1988 that targeting a house is not free speech. You don't get a free... Just help me understand the reason in that case. Why isn't that free speech? Because it's pervasive... What do you mean targeting? It's targeting a home. And targeting a home with a constant protest and constant videotaping is not free speech. And Judge Irizarry found that too. She was raised by the FLA, and she found that too, that it's not a free speech issue. Just to target a home as opposed to, let's suppose, writing a letter to your congressman or writing a letter to your officials or taping maybe even policemen, which even Judge Irizarry felt was not valid. Can an individual sit and take extensive written notes about what he or she sees going on next door? If we don't see it, I think the problem here is the issue of injury. There's a pervasiveness here. There's an affidavit which is unrebutted that our clients, both the staff and the residents felt threatened. If somebody just took notes, let's suppose the McClody's just took... and they just taped a quote from their house. That would not be the same case as what we had here, which is basically videotaping constantly for no reason whatsoever. There's no allegation here that they posted the videos on social media or anything like that? No, but we don't need to do that. They interfered. They basically intimidated or they threatened or the people felt stressed out in the home. They were constantly... They were feeling stressed out. Their rights were to live in their home. You said they threatened the people. What were the threats? Not threatened in that sense. They interfered with the people living in the home. They stressed out the people living in the home and they have a right not to be... Did they go into the home? No, they didn't go into the home, but they came right up to the... What did they do to stress them out? They came right up to the residents and... Trespassed? Pardon? Did they trespass? They didn't trespass, but that shouldn't... They didn't trespass, but... They had a good night. I'm sorry. They didn't trespass in the sense of going onto the Birch property, but they came up to the Birch residents from their own property and videotaped them. And... And that's interference. They shouldn't... Does it violate some sort of ordinance or local law or anything like that? It violates the Federal Fair Housing Act. It will also violate the New York City Human Rights Law, which the court got wrong because New York City Human Rights Law has to be interpreted more liberally. The court below said that it had to be interpreted the same way, but in the Mihela case and this court and many other cases, the court held that it's got to be interpreted differently, got to be more interpreted liberally. And there's any evidence at all pretext. In this case, the Willotes did not show that they had to videotape these people all the time. The evidence on the record shows that they videotaped people pervasively. Nothing... Let me just jump in. Even accepting the idea that this type of pervasive videotaping is interference with the enjoyment of the home and all of that, I'm still looking to see the connection to show that the reasoning for this was racial discrimination. And it sounds like the way that you're... The way that I'm hearing your argument is that you seem to be saying that this videotaping was unreasonable given what they're saying it was in response to, which may be the case, but your burden is to show that the reason for doing this was racial discrimination, and that's the part I'm still having trouble with. Let me try and answer that. Assuming they asserted a legitimate reason for the videotaping, it's our burden then to show a pretext. Showing a pretext shows that there's no credence to what they did, and there's no credence in two ways. Number one, the affidavit of Ms. Martin Walker, which showed that the videotaping had much, much more to do with people, nothing but wrongful conduct of staff. And look in the video log. There were 700 videos in the video log, none of which really pointed out wrongful behavior of the staff. That lends an issue of credence. That's a question of credence, which... That they have a real reason. And it goes back to a decision actually to some degree that Judge Parker decided many years ago on the Southern District in a case called Innovative Health Systems versus City of White Plains, where the City of White Plains gave reasons which were not legitimate and not really... Didn't make any sense for explaining why they required certain permits or denied a particular permit. And Judge Parker found in that case that indeed that... Because if something didn't add up there, there's possibly an issue of discrimination. This case should have gone to the jury, is what we're saying, to determine whether indeed the Melodies had a legitimate reason or that we showed pretext. And under the city law, since we at least showed some degree of pretext, we should have gone to the jury, at least on the city law, and not have been thrown out on the fact. Thank you very much, everybody. Thank you. Thank you, Mr. Schoenfeld. You're preserved two minutes for rebuttal. Mr. Murray? Good morning. My name is Chris Murray. I represent the defendants' appellees in this case. The district court properly applied the balancing test, the burden-shifting analysis, to dismiss the claims in this case. Leaving aside the issue of whether taking videos or photographs or recordings on one's own property can somehow constitute discrimination or intimidation under the FHA... I'm sorry. I just, I have to jump in on that because I don't quite want to leave that aside yet. This does really strike me as extraordinary. I mean, the record indicates that they were recording nearly every day for years. That seems like interference. If I could just finish. That strikes me as interference with enjoyment of your home if you know that every, or this facility where people are living, that every time you enter or leave, that there's the potential that your neighbors are filming you? That's not what the record shows. The record has about 700 videotapes over a five-year period. That's not every day. And the reason there are so many videotapes is the constant problems that have been emanating from the Birch facility. They were going to, the non-discriminatory reason, they had a state lawsuit pending against Birch for nuisance. They were videotaping their evidence for this lawsuit. They also had videotapes showing abusive conduct toward the residents, including calling them retards or other horrible things that they sent to the Justice Center, which is the New York State government entity that oversees these houses. Is there a reason, though? I mean, you raise something that I want to jump to, and hopefully you have time to go back to what you wanted to address. But with regard to disability discrimination, I mean, it does appear there's evidence in the record to support, perhaps, that that's, and the district court found, with regard to the prima facie case, discriminatory animus based on disability. And your reference to sort of them, the lodies, I'm hoping, reporting them to government officials, there's also evidence in the record of them saying they wanted this home shut down, that this is like living next to a psych ward, those types of things. There was, they wanted, they did say they wanted it shut down because of the way that it was interfering with their property. When the home was first opened, they went to the home. They offered to provide services to the home. They did not oppose the opening of the home. It was only after the home was open and all this activity was happening, and you've got to understand the context. There were two people in this home that Birch admits should not have been there. They were not developmentally disabled. They had serious mental illness. They threw bleach into the eyes of a staff member. They physically threatened. Mrs. Walody saying that she's going to kill her. They went onto her property. This woman went onto her property, started pounding on her door, threatening her. They wanted to record this behavior, and they did. And they offered that as a reason why they were doing this. It wasn't to harass these people. It wasn't to close the home because it served disabled. From the beginning, they were open to it and helpful to it. It was only after they moved in and these problems started. And then why would they, if they were taking the videos to harass somebody, why would they be sending it to the police? Why would they be sending it to the Justice Center? They even sent it, and there's plenty in the record, specific instances where they sent it to Birch officials at the main office to say, please help us. We want this to stop. They then went through this for three or four years. They didn't do anything. They were begging them to do something, especially with regard to these two females that they know shouldn't be in there because they were not capable of treating those people. And only after four years, they end up filing a lawsuit in state court based on nuisance. Then a year after the lawsuit's filed, when there's a settlement meeting planned with the court, they get served with this FHA. If they were engaging in this discriminatory conduct over all these years, why didn't Birch do anything? This was an afterthought. It was an attempt to get leverage. These people had been put through a horrible situation. They recorded what was going on as proof, not to discriminate, not to harass. And as the district court found properly, that there was no evidence that they were doing this for a discriminatory reason or to show that the reason that they proffered was a pretext. It was a legitimate, non-discriminatory reason. The burden then shifted to them to come up with evidence showing it was a pretext. In their brief, they basically say, well, they were videotaping, blocking a driveway, garbage, loud noise, and that's too trivial to justify videotaping. Too trivial to who? If you're living through it, it's just like a subjective determination, oh, they shouldn't have been videotaping it because they should have just lived with this. And somehow that makes it a pretext. That's not evidence of a pretext, as the district court properly found. I still think there's an issue with regard to whether a prima facie case was even made out, given that a lot of the tapes that they're complaining about, they're sitting in their living room. In no one's view. How would they, in your view, have gone about showing that it was pretext? I mean, as I understand the argument that Mr. Schoenfeld's making, it's that they didn't have to be doing all this video. I think both the volume and the memes, when certain things could have been established with less, what you're describing could have been done with less invasive methods. But that doesn't show discriminatory intent. They say, well, you shouldn't have done it so much. It's not overpriced. We're past discriminatory intent. We're just, I mean, on pretext. In fact, that it was, well, that's my question to you, I guess. Is that what's required? I think they have to have some concrete evidence of pretext. And they don't have it here. And that's where the disreportability properly found. There was, you know, some of this taping, they were sitting in their living room. No one could see them. They were recording the noises coming through their wall. And that is, you know, there's no reason. There's no reason for them to, if it was something that was a pretext, why would they be sending it to the police? Why would they be sending it to the justice center? Why would they be sending it to first corporate headquarters to try to get help in this situation? There's no evidence of a pretext. It's not a pretext. And I think that's what the disreport held is a complete lack of evidence showing that their videotaping was not for the reasons they stated. One, because they saw harm to the residents. And two, because it was interfering with their property. That was their burden to come forward under McDonnell Douglas. And they simply failed to do that. And so the disreport believed properly, correctly dismissed their claim. Just briefly with regard to the state law claim, the standard's the same. It's McDonnell Douglas. It's the burden shifting. If the federal claim falls for that reason, the state law claim falls for that reason. This was after discovery. They decided to join the two claims together. The court properly dismissed both claims. If there are any other questions? If not, good. Thank you, Mr. Wright. Mr. Schenfeld, you have two minutes. Thank you. Let me address the last point first. The McHale decision, the disreport held the city human rights law has to be interpreted differently than the federal law. The federal law is a ceiling. It's not a ceiling. It can be interpreted differently and more broadly and more liberally by the city human rights law. And this court has held that over and over again. It is pretext because of the fact that their reasons lack credence. In their affidavits, both Jack and Corinne Lowy's affidavit and also in the 56-1 statement, they said the reason is wrongful behavior by the staff was their reason for videotaping. Nothing involving any incident before wrongful behavior of the staff. And so we did show a pretext. We showed that, number one, the videotaping of 700-some-odd videos in the log had nothing to do with wrongful behavior of the staff. They had to do with anything from videotaping two of us coming into the home or videotaping just that. What I understand your adversary had been saying is that you have to show more than just that, but in fact that there was some kind of discriminatory animus that was the real reason, not just the reason they gave was not true. Well, I don't think I would disagree with him. We don't have to show. They're not going to come out and say videotaping was the race or disability of the people. Do you have any evidence that it was motivated by animus against disability? What we believe is happening, they want this home closed. We believe they do not want it because their statements say they don't want to live next door to people of a different race and they don't want to live next door to people with disability for that reason. And that together with the evidence... But they let them in the first place. Pardon? That's not exactly... They posed no objection in the first instance to these folks moving in. That's not exactly true. What happened was they don't have the right to object as neighbors. The community board there would have the right to object. The community board did not object. They never came back. They visited the home initially. They never came back again. They said they'd help out in nutrition issues and other issues. They never came back again, which is why it's suspicious, why they're saying now that there is... It's suspicious why they're saying now that there's wrongful behavior by the staff because they've never been in the home since the home opened. And you're saying that there's no constitutional protection for me sitting in my living room running my video camera? I don't... Why can't I run it as much as I want? If you videotape people on the outside, in this case, the Maloney's were not only in their living room, they were outside in their yard videotaping. Well, let's just take in the living room. Can I sit in my living room and videotape all I want through the window? It would probably be a state law nuisance, perhaps, but it would definitely be... How would that be a nuisance? How is that interfering with anybody's legitimate expectations of privacy or whatever? That'd be stressing people out, and that's what the Frisbee case said in the... How does videotaping someone stress folks out? I mean, why do I have a right not to be... Some sort of right embedded somewhere not to be stressed out because someone sitting on their own property is doing something? Because, again, even Judge Rosari found out that was stressful to these people. His affidavit was not rebutted by Mr. Murray or by the Maloney's saying that this was stressful to people to have constant videotaping. And Judge Park is right. The issue here is pervasiveness, and they didn't come back. It was pretentious, but they didn't come back with any evidence showing that their reason for that, which was a wrongful behavior of the staff, was supported by any evidence they put in the record. And that's why putting everything together, putting together the animus, which was unquestionably showed, putting together the reasons why they gave, which do not support pervasive videotaping. One of the contentions is that among the residents of this facility were two people who were mentally ill and were misbehaving. That's incorrect that they're mentally ill. Their diagnosis, their dual diagnosis, their primary diagnosis was developmental disability. So that's a misnomer. But even assuming they had a dual diagnosis, that doesn't... The other half of the diagnosis. Pardon? You said it was a dual diagnosis. The other half is mental illness. The fact that two of them... Pardon me? Mental illness. And the fact that two of them had a mental illness does not justify all the videotaping. In fact, all the residents, the four residents who did not have a dual diagnosis, they were videotaped too. The issue here is the pervasiveness combined with the animus they've shown. They want this home gone, and they want to use either they want to harass us to get the home gone, or they want to get some government agency to close down the home. And that's what interference is under the Fair Housing Act, and certainly is interference under the City Human Rights Law, which is to be interpreted more liberally, and in which we should have at least gotten a trial before a jury on this. Thank you very much. Thank you. Thank you both. Thank you. We'll take the case under advisement.